Scott Emerton and Kristi Emerton sued Kenny Williford and Charlotte Williford, individually and d/b/a Ben-Mor Village, in the Chambers Circuit Court. The dispute involved the lease-purchase of a mobile home. After a jury rendered a verdict in favor of the Emertons, the trial court entered a judgment awarding them $383,000 in compensatory and punitive damages. The Willifords appeal, arguing: (1) that the verdict is unsupported by the evidence, (2) that the amount of damages awarded is unsupported by the evidence, (3) that the trial court improperly dismissed their Batson v. Kentucky, 476 U.S. 79 (1986), challenge, and (4) that the trial court improperly allowed the trial to proceed over their objection that the Emertons' counsel had a conflict of interest that prohibited him from serving as their counsel in this matter. We affirm in part and remand with directions.
 I.
On August 28, 1998, the Emertons entered into a contract with the Willifords pursuant to which the Emertons were to purchase a mobile home from the Willifords under a lease-to-own plan. The Willifords own and operate Ben-Mor Village, a trailer park in Chambers County. Under the terms of the lease-purchase contract, the Emertons made an initial down payment of $500 and financed the remaining $2,500 at 9% interest. They agreed to make monthly payments of $150 until the balance was paid in full, at which point they would gain title to the mobile home. The Emertons simultaneously entered into a separate lot-rental contract with the Willifords pursuant to which the Emertons agreed to pay $100 per month to rent a lot in Ben-Mor Village, plus $10 per month for garbage collection and $15 per month for water.[1]
Shortly after entering into the lease-purchase contract, the Emertons decided to upgrade, and, on October 9, 1998, they made a $500 down payment on a newer and larger mobile home and entered into another lease-purchase contract with the Willifords for the second mobile home. This contract replaced the August 28 contract, but, except for the amount financed and the monthly payments, it was identical in all respects to that contract. The amount financed in the October lease-purchase contract was $7,500, and the monthly payments increased to $200. The $125 lot rental and garbage and water obligation remained unchanged, bringing the Emertons' total normal monthly obligation to the Willifords to $325.
In November 1998, because of a problem with their automobile, the Emertons were unable to meet their monthly obligation, and on November 13, 1998, they made only a partial payment of $260.[2] Because of the automobile problem, the Emertons were forced to move in with Scott Emerton's parents so that his parents could drive Scott to and from work. Because the Emertons had failed to pay their entire balance, the Willifords, on November 23, placed on the door of the mobile home a "Notice of Termination of Tenancy/Lease." The notice warned the Emertons that if they did not surrender possession of the mobile home within 10 days they would face legal action. On December 1, the Willifords placed a second, identical "Notice of Termination of Tenancy/Lease" on the door of the mobile home.[3]
On December 11, the Emertons and Scott's mother returned to the mobile home with a truck to move their personal belongings out of the home. The Emertons claim that when they arrived, they saw that the Willifords had removed the door to the mobile home and the Willifords were inside. Upon seeing the Emertons, Kenny Williford allegedly became angry and told them they had 10 minutes to get everything out of the home before he telephoned the police. The Emertons claim that they then gathered what they could in 10 minutes and left, leaving many of their possessions in the mobile home.
On March 21, 2000, the Emertons sued the Willifords, alleging conversion, trespass, the tort of outrage, and breach of contract. The case was tried before a jury on September 16, 2002. The jury returned verdicts in favor of the Emertons on their conversion and breach-of-contract claims.[4] On the breach-of-contract claim, the jury awarded the Emertons $25,000 in compensatory damages, interest, and costs. On the conversion claim, the jury awarded the Emertons $8,000 in compensatory damages and $350,000 in punitive damages. On September 19, 2002, the trial court entered a judgment in favor of the Emertons in the total amount of $383,000 in accordance with the jury verdict.
The Willifords filed a motion for a new trial or a judgment as a matter of law ("JML")[5] and a motion for a remittitur. The trial court denied both motions, and the Willifords appealed.
 II.
The Willifords' first argue on appeal that the jury's verdicts in favor of the Emertons on the conversion and breach-of-contract claims are unsupported by the evidence. In considering previous appeals challenging a jury's verdict, this Court has said:
 "Upon review of a jury verdict, we presume that the verdict was correct; we review the tendencies of the evidence most favorably to the prevailing party; and we indulge such reasonable inferences as the jury was free to draw from the evidence. We will not overturn a jury verdict unless the evidence against the verdict is so much more credible and convincing to the mind than the evidence supporting the verdict that it clearly indicates that the jury's verdict was wrong and unjust."
Campbell v. Burns, 512 So.2d 1341, 1343 (Ala. 1987). Moreover, this presumption of correctness "is strengthened by the trial court's denial of the motion for a new trial." Friendly Credit Union v. Campbell,579 So.2d 1288, 1291 (Ala. 1991).
The Willifords argue that there was no basis on which the jury could have found them liable on the breach-of-contract and conversion claims because, they allege, the evidence was undisputed that the Emertons breached the contract first by failing to meet their entire obligation for November, and "[u]nder general principles of contract law, a substantial breach by one party excuses further performance by the other." Nationwide Mutual Ins. Co. v. Clay, 525 So.2d 1339, 1343 (Ala. 1988). The Willifords also argue that, because the lease-purchase contract stated that all rights to the mobile home reverted to the Willifords if the Emertons did not make a payment within 30 days of its becoming due, they cannot be found liable for conversion.
The Emertons argue that, based on their payment on November 13 of $260, they never breached the lease-purchase contract, which is the only contract they are suing on, and which required a monthly payment of only $200. Therefore, they argue, because they were current on the payment required by the lease-purchase contract, the Willifords had no right to terminate the lease-purchase contract or to interfere with their possession of the mobile home. They acknowledge that they may have breached the lot-rental contract, but they argue that that breach should not be imputed to the lease-purchase contract, an entirely separate agreement.
Moreover, they argue, even if their failure to meet all of their November obligation constituted a breach of the lease-purchase contract, that breach did not occur until 30 days after the end of November, or December 30, because the lease-purchase contract did not specify a due date for payments made under it. The lease-purchase contract states only that payments should be made "on the same day of each month"; it never explicitly states what that date is. The Willifords argue that it is clear that the monthly payments for the mobile home were due on the first day of each month based on (1) the separate lot-rental contract calling for payment of the amount due under that contract on the first day of each month and (2) an amortization schedule the Emertons were given when they signed the lease-purchase contract that listed the monthly payments as being paid on the first day of the month in which they were due. However, as the Emertons counter, the lease-purchase contract contains a merger clause stating that the contract "is the entire agreement of the parties and there are no other agreements either written or oral, other than is expressly set forth herein." Therefore, they argue, the lot-rental contract and the amortization schedule cannot be considered when interpreting the lease-purchase contract.
When a contract is ambiguous, its meaning is an issue for the jury to determine. Kirkland Co. of Anniston, P.C. v. A M Food Serv.,Inc., 579 So.2d 1278, 1282 (Ala. 1991). After hearing testimony regarding the above arguments, the jury returned verdicts finding that the Willifords were liable for conversion and for breach of contract. The Willifords have not shown that "the evidence against the verdict is so much more credible and convincing to the mind than the evidence supporting the verdict that it clearly indicates that the jury's verdict was wrong and unjust," Campbell, 512 So.2d at 1343; therefore, this Court will not disturb the jury verdicts. See Marsh v. Green, 782 So.2d 223,227 (Ala. 2000) (stating that this Court will "decline to substitute [its] judgment for that of the jury in matters dealing with credibility of witnesses and weight of the evidence").
 III.
The Willifords argue that the amount of damages awarded the Emertons was unsupported by the evidence. The jury awarded a total of $383,000 in damages: $25,000 in compensatory damages, interest, and costs on the breach-of-contract claim; and $8,000 in compensatory damages plus $350,000 in punitive damages on the conversion claim.
We pretermit any consideration of the Willifords' argument that the evidence was insufficient to support the damages awarded on the breach-of-contract claim, because the Willifords failed to preserve that issue for our review. That argument was raised for the first time in the Willifords' posttrial motion. As this Court stated in IndustrialTechnologies, Inc. v. Jacobs Bank, [Ms. 1011966, April 25, 2003], ___ So.2d ___, ___ (Ala. 2003):
 "It is well-established that `a timely post-trial motion [for a JML] is necessary to permit an appellate court to consider the sufficiency of the evidence.' Great Atl. Pac. Tea Co. v. Sealy, 374 So.2d 877, 880 (Ala. 1979); see also Joseph Land Co. v. Gresham, 603 So.2d 923, 927-28 (Ala. 1992); King Mines Resort, Inc. v. Malachi Mining Minerals, Inc., 518 So.2d 714, 716 (Ala. 1987). However, `[i]t is a procedural absolute that a [posttrial motion for a JML], based on the "insufficiency of the evidence," is improper, if the party has not moved for a [JML] on the same ground at the close of all the evidence.' Barnes v. Dale, 530 So.2d 770, 776 (Ala. 1988)."
In Industrial Technologies, the defendant, at the close of all the evidence, moved for a JML on six grounds; however, none of those six grounds included a challenge to the sufficiency of the evidence as to the compensatory damages. Id. Therefore, this Court held that "[b]ecause that argument was first raised in a posttrial motion for a JML, it is not reviewable." ___ So.2d at ___.
In the present case, counsel for the Willifords stated at the close of all the evidence that the "only motion [she] want[ed] to renew [was] for a directed verdict[6] on the conversion."[7] Because this motion did not implicate the breach-of-contract claim, the Willifords' challenge to the sufficiency of the evidence supporting the damages awarded on the breach-of-contract claim was raised for the first time when the Willifords filed their posttrial motion for a JML. Therefore, the issue was not preserved for appellate review.
The Willifords did preserve for review their argument that the $8,000 compensatory-damages award on the Emertons' conversion claim was not supported by the evidence. At trial the Emertons presented evidence of only $2,180 in actual damages; on appeal, the Emertons claim that the extra $5,820 can be attributed to the mental anguish associated with the loss of items with sentimental value that were in the mobile home, including wedding gifts and wedding photographs.[8] We agree. Therefore, we affirm the award of $8,000 in compensatory damages on the conversion claim. See New Plan Realty Trust v. Morgan, 792 So.2d 351
(Ala. 2001) (compensatory-damages award of $100,000 affirmed where landlord converted tenant's property worth $46,679, because the additional amount could be damages attributed to mental anguish).
Finally, the Willifords challenge the jury's verdict awarding the Emertons $350,000 in punitive damages on their conversion claim. The Willifords first argue that we should remand this case to the trial court because that court failed to put in writing its reasons for denying their postjudgment motion for a remittitur, as required by Hammond v. City ofGadsden, 493 So.2d 1374 (Ala. 1986). Second, they argue that the award is excessive and outside the constitutional parameters set forth by the Supreme Court of the United States in BMW of North America, Inc. v.Gore, 517 U.S. 559 (1996). After the judgment was entered on the jury's verdict, the Willifords filed both a motion for a new trial or a JML and a motion for a remittitur styled as a "Motion to Review and Conduct Hearing or Receive Additional Evidence or Both on Punitive Damage[s] Award." The trial court held a hearing and denied both motions in a one paragraph order. The order reads:
 "This matter coming before the Court on Defendants' Motion for New Trial or [JML] and Motion to Review and Conduct Hearing or Receive Additional Evidence or Both on Punitive Damage[s] Award and the Court having taken testimony, heard argument from counsel and receiving exhibits and caselaw and considering the same, it is hereby ordered that said motions are DENIED."
It is unclear whether the trial court allowed the defendants to submit additional evidence on the propriety of the amount of the punitive-damages award,[9] but even if it did consider such evidence and denied a remittitur, without a written statement of the reasons for that denial the requirements of Hammond have not been satisfied. As we explained in Love v. Johnson, 775 So.2d 127, 127-28 (Ala. 2000), such a written statement is necessary before this Court can conduct a proper review on appeal:
 "In Hammond [v. City of Gadsden, 493 So.2d 1374 (Ala. 1986)], this Court required that a trial court `reflect in the record the reasons for interfering with a jury verdict, or refusing to do so, on the grounds of excessiveness of the damages.' 493 So.2d at 1379; see also ALFA Mut. Ins. Co. v. Brewton, 554 So.2d 953 (Ala. 1989). In Hammond, this Court stated the reason for the requirement:
 "`[T]he trial judge is better positioned to decide whether the verdict is . . . flawed [as excessive]. He has the advantage of observing all of the parties to the trial — plaintiff and defendant and their respective attorneys, as well as the jury and its reaction to all of the others. There are many facets of a trial that can never be captured in a record, so that the appellate courts are at a special disadvantage when they are called upon to review [a] trial [court's] action in this sensitive area. . . .'
"493 So.2d at 1378-79."
When a trial court fails to put in writing its reasons for denying a motion to review a punitive-damages award for excessiveness, this Court's practice has been to remand the cause for the trial court to enter an order in compliance with Hammond. See, e.g., Love, 775 So.2d at 128;Spencer v. Lawson, 815 So.2d 502 (Ala. 2001); Southern Pine Elec. Coop.v. Burch, [Ms. 1020066, March 28, 2003] ___ So.2d ___ (Ala. 2003). We therefore remand this case to the trial court for the entry of an order that complies with the requirements of Hammond. On return to remand, the Willifords will have the opportunity to renew their argument that the punitive-damages award is outside the constitutional parameters set forth in Gore and Hammond/Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989), should they still wish to do so.
 IV.
The Willifords also argue that the trial court erred in overruling their motion, made pursuant to Batson v. Kentucky, 476 U.S. 79 (1986), challenging the jury's composition. Specifically, the Willifords argue that the trial court erred in placing the burden on them to show that the Emertons' strikes were racially motivated, when the burden should have been on the Emertons to show that the strikes were not racially motivated. This Court has consistently held that "[t]he burden of persuasion is initially on the party alleging a discriminatory use of peremptory challenges to establish a prima facie case of discrimination."Thomas v. Diversified Contractors, Inc., 578 So.2d 1254, 1255 (Ala. 1991). Once a prima facie case has been established, the burden then shifts to the other party to provide a legitimate nondiscriminatory reason for the challenges. Id. In the present case, the trial court correctly placed the burden on the Willifords to establish a prima facie case of discrimination. When the only argument that the Willifords offered in support of their Batson motion was the fact that the impaneled jury consisted of 1 white juror and 11 black jurors, the trial court concluded that the Willifords had not established a prima facie case of discrimination and denied the motion.
A trial court's ruling on a Batson motion is entitled to great deference, and an appellate court will not reverse a judgment because of such a ruling unless that ruling is shown to be clearly erroneous. Exparte Branch, 526 So.2d 609, 625 (Ala. 1987). The Willifords have failed to make such a showing. In Sharrief v. Gerlach, 798 So.2d 646, 655 (Ala. 2001), this Court stated that "`"`it is important that the defendant come forward with facts, not just numbers alone, when asking the [trial] court to find a prima facie case of . . . discrimination.'"'" (QuotingMcElemore v. State, 798 So.2d 693, 696 (Ala.Crim.App. 2000), quoting other cases.) This Court has repeatedly listed the different ways a party can establish a prima facie case of discrimination for purposes of aBatson claim; however, the Willifords instead relied upon "numbers alone." For that reason, the trial court properly determined that the Willifords had not established a prima facie case and denied theirBatson motion without requiring the Emertons to provide race-neutral reasons for their strikes. See also Ex parte Trawick, 698 So.2d 162, 168
(Ala. 1997) ("Without more, we do not find that the number of strikes . . . used to remove women from the venire is sufficient to establish a prima facie case of gender discrimination.").
 V.
Finally, the Willifords argue that the trial court improperly allowed the trial to proceed over their objection that the Emertons' counsel had a conflict of interest that prohibited him from serving as their counsel in this matter. At the conclusion of voir dire, the Willifords informed the court that they had consulted with William Smith, an attorney who was then assisting the Emertons' primary counsel, Charles Reynolds, with the trial, about representing them in this case. Smith acknowledged meeting with the Willifords about representing them in a case, but stated that he did not remember it being the present case and that he never represented them. Nevertheless, because of Smith's consultation with the Willifords, the court found that Smith had a conflict and excused Smith from the case.
While acknowledging that the trial court promptly excused Smith from the case upon learning of the conflict, the Willifords now argue that the court erred in failing also to excuse Reynolds from the case. In support of this proposition, the Willifords cite Green v. Montgomery County,784 F. Supp. 841 (M.D. Ala. 1992) (holding that under Rules 1.9 and 1.10, Ala. R. Prof. Cond., an attorney and his law firm were disqualified from participating in litigation where the attorney had discussed the underlying facts of the case with the opposing party while considering whether to represent that party). However, the Emertons argue that the record shows that the Willifords waived any objection they had to Reynolds's continued participation in the trial.
After the court determined that Smith would have to be excused from the case, the Willifords' attorneys, Susan Harmon and Thomas Worthy, engaged in the following exchange with the court:
 "THE COURT: Now, being that he's not involved anymore, are you waiving any objection to him having been here to this point, though?
"MS. HARMON: No, sir.
"THE COURT: You're not?
 "MS. HARMON: I don't have a problem with him being here at all as far as sitting here. He hasn't questioned the jury.
 "THE COURT: Hold on. We're not talking about that. That's not what we're talking about, Susan. What I'm asking is are you waiving any conflict, any objection to him having been here to this point?
"MR. WORTHY: We'll reserve that.
"THE COURT: Y'all will reserve that?
 "MR. WORTHY: Well, what my concern is, is that obviously if he's got a conflict of interest, he shouldn't have been in the case at all.
"THE COURT: Well, that's what we're about to resolve.
"MR. WORTHY: Okay.
 "MS. HARMON: What Judge is saying, up until this point, Bill [Smith] has not questioned the jury or spoken to them. I don't have a problem with that.
 "THE COURT: Yeah, that's what I'm talking about. I just want to make sure that we don't have any problem as to his appearance in this case for the [Emertons] up to this point.
"MS. HARMON: No.
"MR. WORTHY: No, none at this point.
 "MS. HARMON: Because he has not even voir dired the jury.
 "THE COURT: Okay. Well, then, Bill, I will have to excuse you from this case, then.
"MR. WORTHY: Thank you, Judge.
"THE COURT: Okay. Thank you."
As this exchange indicates, the Willifords' attorneys did not move the trial court to disqualify Reynolds. They did initially indicate that they would not waive any objections associated with Smith's participation in the trial; however, after discussing the matter further, the judge again stated that he wanted "to make sure that we don't have any problem as to [Smith's] appearance in this case for the [Emertons] up to this point." The Willifords' attorneys then responded "No" and "No, none at this point" and the judge proceeded with jury selection. At no point did the Willifords object to continuing the trial. Because they failed to object at that time, they cannot now raise the issue on appeal.
 VI.
The trial court's order denying the Willifords' motion for a new trial is affirmed. We remand the cause to the trial court, however, for that court to take such steps as are necessary to enter an order in compliance with Hammond. The trial court is instructed to file a return to this Court within 56 days of the release of this opinion, after which the Willifords will have 14 days to file a supplemental brief, if they choose to do so. The Emertons will then have seven days to respond, and the Willifords may then file a reply brief within seven days of the Emerton's response.
AFFIRMED IN PART; REMANDED WITH DIRECTIONS.
Houston, Lyons, Brown, Johnstone, Harwood, Woodall, and Stuart, JJ., concur.
[1] The $15 monthly fee for water covered only the first 3,000 gallons. The Emertons had to pay an additional amount for any water they used in excess of 3,000 gallons.
[2] The Emertons allege that the payment was to be applied first to fulfill their $200 mobile-home payment, with the remainder then being applied to the other fees. However, there is no evidence indicating that they informed the Willifords that the payment was so earmarked.
[3] At trial, Scott Emerton gave contradictory testimony as to whether he received the November 23 notice, the December 1 notice, or both. However, it is undisputed that he received at least one of the notices while he was at the mobile home picking up mail.
[4] At the conclusion of testimony, the Emertons withdrew their tort-of-outrage and trespass claims.
[5] Rule 50, Ala. R. Civ. P., as amended in 1995, renamed the "motion for a judgment notwithstanding the verdict" as a "renewed motion for a judgment as a matter of law."
[6] Rule 50, Ala. R. Civ. P., as amended in 1995, renamed the "motion for a directed verdict" as a "motion for a judgment as a matter of law."
[7] At the close of the Emertons' case, defense counsel had moved for a "directed verdict," actually a JML, see note 6, on the conversion count on the theory that the Emertons had failed to prove ownership of any of the property allegedly converted.
[8] The Emertons concede that their failure to testify as to the value of the sentimental items precludes them from recovering an award based on the actual or alleged sentimental value of the items. See DependableIns. Co. v. Kirkpatrick, 514 So.2d 804 (Ala. 1987) (holding that an award for compensatory damages cannot be based on speculation).
[9] "`[I]n all cases wherein a verdict for punitive damages is awarded, the trial court shall, upon motion of any party, either conduct hearings or receive additional evidence, or both, concerning the amount of punitive damages.'" Byrd v. Petelinski, 757 So.2d 400, 401 (Ala. 2000) (quoting § 6-11-23(b), Ala. Code 1975) (emphasis omitted).